In the Matter of CHARAY INDUS-
TRIES, INC., d/b/a Sarge's
Camper Sales, Debtor.

COACHMEN INDUSTRIES,
INC., Plaintiff,

v.

CHARAY INDUSTRIES, INC., d/b/a
Sarge's Camper Sales, David A. Cuvrell
as Trustee for Charay Industries, Inc.,
Defendants.

Bankruptcy No. 81–00433.
Adv. No. 81–0137.

United States Bankruptcy Court,
E.D. Michigan, S.D.
Flint.

Nov. 1, 1982.

Richard M. Goldstein, Flint, Mich., James
L. English, Detroit, Mich., for plaintiff.

Dennis M. Haley, Flint, Mich., for defendants.

## MEMORANDUM OPINION

HAROLD H. BOBIER, Bankruptcy Judge.

*Introduction*

This matter comes before the Court upon the complaint filed by Coachmen Industries, Inc. ("Coachmen"), as the plaintiff, against the debtor herein, Charay Industries, Inc. ("Charay"), as the defendant, seeking relief from the automatic stay which was imposed pursuant to 11 U.S.C. § 362 upon the filing of the debtor's voluntary petition for relief under Chapter 11 of the Bankruptcy Reform Act of 1978 ("Code"). Coachmen specifically seeks possession of the inventory, or the proceeds thereof, which was secured by virtue of an inventory financing arrangement between Charay and Finance America Private Brands, Inc. ("Finance"), which assigned its interest to Coachmen. In addition, Coachmen requested that the Dealer/Manufacturer Sales Agreement ("Franchise") between Charay and Shasta Industries, Inc. ("Shasta"), a division of Coachmen be terminated.

Charay filed its answer to the complaint, along with affirmative defenses and a counter-complaint. In essence, Charay claims that Coachmen is adequately protected in its property interests, and accordingly, is not entitled to relief from the automatic stay. Charay also disputes the amount owed to Coachmen for the inventory Charay received under the inventory financing arrangement.

A preliminary hearing was held on May 18, 1981, and as a result of the preliminary hearing, the Court entered a Pretrial Order and an Order Pendente Lite.

An interim appeal was taken and an order entered by the District Court which in part reversed and in part remanded for further proceedings an interim order of this court. First, the District Court reversed the interim order of this court restraining the termination of the franchise agreement between the parties. Second, the District Court remanded to this court for a determination of the adequate protection to which Coachmen is entitled in the form of the computation of the depreciation on Coachmen's collateral and the computation of the interest rate for its secured indebtedness. Since proofs at trial were presented to this court on the issue of the depreciation of the Coachmen collateral and the loss of interest by Coachmen while restrained from reclaiming its secured collateral, this finding of fact and judgment will be dispositive of the issue of the adequacy of protection to which Coachmen is entitled while restrained from repossessing its secured collateral, as well as all other issues tried before the court.

*Findings of Fact*

Charay is a recreational vehicle dealer and conducts business under the assumed name of Sarge's Camper Sales. The sole owner and chief operating officer of Charay is Edwin Baker, who, through a series of transactions, acquired all of the stock of the corporation in 1976. Faced with a drastic reduction in sales during the later part of 1980 and early part of 1981, as a result of increases in the cost of fossil fuels, Charay filed its petition for relief under Chapter 11 of the Bankruptcy Code with this Court on April 20, 1981.

Shasta, a division of Coachmen, is a manufacturer of recreational vehicles. On April 7, 1976, Shasta and Charay entered into a contract entitled Dealer/Manufacturer Sales Agreement. (Exh. 1.) The agreement, which really is in the nature of a franchise, grants an exclusive territory covering four Michigan counties to Charay for the purpose of allowing Charay to be the only dealer of Shasta equipment in those counties. In exchange for this exclusive territory, Charay agreed to purchase $300,000 worth of Shasta equipment each year. The agreement also contained additional provisions with respect to the obligations of both parties.

Pursuant to a separate written agreement between Coachmen and Finance, which was not offered into evidence at trial, Finance provides financing arrangements for Coachmen recreational equipment dealers. In other words, as a result of the agreement between Coachmen and Finance,

Charay's inventory financing for Coachmen equipment was provided by Finance.

During the years from 1976 through 1980, Charay sold large volumes of merchandise, a great deal of which was produced by Shasta. In fact, Charay was so successful during this period of time that it became a recognized sales leader in the United States of recreational equipment.

On July 6, 1978, Charay executed a security agreement which granted Finance a secured interest in all present and after-acquired inventory of new and used recreational vehicles. (Exh. 2.) Finance properly perfected its security interest when it filed a financing statement with the Michigan Secretary of State's office. (Exh. 4.) Pursuant to this financing arrangement, Charay received monthly billing statements from Finance which detailed the charges for the previous month's transactions and indicated at the bottom of each statement the prime rate of interest to be applied for the next month's billing. (Exh. 7.) Although the interest charges were allegedly based on the prime rates indicated in each month's statement, there were additional charges made from time to time, designated as curtailment and flat charges, which were apparently determined by the aging of the inventory. However, the specific rate of interest and other charges assessed against Charay were never specifically stated in any of the financing documents. There was no mention of any applicable interest rates to be applied in either the security agreement (Exh. 2) or the financing statement (Exh. 4). The only mention of applicable interest rates is found in the monthly billing statements (Exh. 7) and the dealer inventory finance plan (Exh. 8). As stated above, the only reference to interest charges in the monthly statements was the prime rate which was to be used for the succeeding month. The monthly statements did not set forth the actual interest to be charged either currently or for future months. In fact, the only complete itemization and formula for the calculation of interest charges is found in the dealer inventory finance plan. However, the finance plan was not signed by any parties in interest and there was conflicting testimony received at trial as to whether Charay ever received a copy of the finance plan; this court will hold that it did not. The only properly executed document with a specified rate of interest which was submitted into evidence at trial is a refinancing agreement which calls for interest to be paid at the rate of 7% per annum. (See Exh. 10.)[1]

Based on the foregoing, it is Coachmen's position that the amount due from Charay as of April 14, 1981 was $195,206.92, which figure was set forth in a letter dated April 14, 1981. (Exh. 13.) Charay, on the other hand, alleges that the entire loan transaction was tainted with usury, and as a result, Charay should be entitled to set off any usurious interest payments against the total amount owing to Finance. At trial, counsel for Charay submitted into evidence a schedule of the interest paid by Charay to Finance which indicated that if all interest paid was to be credited against principal, then the amount actually owing to Finance would be $62,335.72. (Exh. K.)

At the preliminary hearing on Coachmen's Complaint for relief from the automatic stay, this court declined to enter an order granting the repossession of the inventory and instead entered an order requiring that Charay proceed to segregate the proceeds of the sale of the Coachmen inventory and use those proceeds of sale only to purchase new inventory which would be identifiable as proceeds of the original Coachmen inventory.

*Issues Involved*

1. IS THE RATE OF INTEREST SOUGHT TO BE CHARGED BY FINANCE ON THE PRINCIPAL AMOUNT OF THE INDEBTEDNESS USURIOUS?

2. WHAT IS BALANCE OWED TO COACHMEN INDUSTRIES, INC.?

3. ADEQUATE ASSURANCE.

4. IS THE PLAINTIFF ENTITLED TO RECLAMATION?

1. Exh. 10 relates to a side note with SBA and is not involved in the issues in this opinion.

*Issue No. 1*

## IS THE RATE OF INTEREST SOUGHT TO BE CHARGED BY FINANCE ON THE PRINCIPAL AMOUNT OF THE INDEBTEDNESS USURIOUS?

 No promissory note was ever introduced into evidence and it appears that none was executed between Charay and FinanceAmerica or Coachmen, FinanceAmerica's assignee. The proofs indicate that the plaintiff received monthly billings. The monthly billings contained a statement indicating that the specific finance charge for the following month would be based upon a specified prime rate. For example, the monthly statement of account for January of 1980 stated the following:

"Rate for February billing will be based upon prime of 12.25%".

There was no indication on the statement, or in any other documentation introduced, indicating what the exact rate of interest pegged to this floating prime rate was. Mr. John Ehrler testified that, in addition to the rate of interest being charged to Charay, there was a finance charge equal to a flat rate of ¼ of 1% of the invoice price on each unit every ninety days in addition to interest and curtailment charges. There was no documentation or agreement introduced to support this charge. Mr. Ehrler testified that, while never included in any documentation or statements, Mr. Baker was verbally advised at a trade show that this additional finance charge would be assessed. .

The defendants testified that they were never aware of what the exact finance charge was and that they never knew about a flat rate finance charge of ¼ of 1% of the invoice price on all units until they heard about it in court.

Based upon the evidence presented, the court makes the finding that there was no agreement in writing between the parties for the payment by Charay for a rate of interest on the principal indebtedness. The issue then becomes whether the lack of an agreement in writing for the payment of a particular rate of interest makes finance charges on the principal indebtedness usurious.

The basic usury provision in Michigan law is found at M.S.A. § 19.15(1) et seq. [M.C. L.A. § 438.31 et seq.] That section basically provides that:

The interest of money shall be at the rate of 5% upon $100 per year, and that the same rate for a greater or less sum, and for a longer or shorter time, except that in all cases it shall be lawful for the parties to stipulate in writing for the payment of any rate of interest, not exceeding 7% per annum.

There are a number of exceptions under Michigan law allowing parties under certain circumstances, sometimes dependent upon the status of the borrower and sometimes dependent upon the status of the lender, to charge in excess of 7% per annum. One of those exceptions is found at M.S.A. § 21.-200(275) [M.C.L.A. § 450.1275]. That subsection of the Michigan Business Corporation's Act provides in pertinent part as follows:

A domestic or foreign corporation, whether or not formed at the request of the lender, may by agreement in writing and not otherwise, agree to pay a rate of interest in excess of the legal rates and in such case the defense of usury is prohibited.

The record does not disclose any "agreement in writing" whereby the defendant has agreed to pay any rate of interest. The plaintiff's trial brief answers that the written agreement requirement is satisfied with the monthly billing statements:

The unchallenged testimony indicated that a monthly billing was sent to dealer, and 'in writing' thereon was the notation of the interest charges being assessed.

The court finds that the monthly statements did not detail a finance charge. The statements only indicated that the rate of interest, whatever it would be, would float in relation to the prime rate of interest. There was no writing specifying the particular rate of interest, meaning the point or fraction of points above or beneath prime that the defendant was actually being

charged.[2] Assuming for arguments sake that the monthly statements did specify the rate of interest being charged and that the statement sufficed as an "agreement in writing", the testimony indicated that some of the finance charge had never been agreed to in writing and had only been communicated to the Defendant verbally. A flat rate finance charge was being assessed on a 90 day basis. This appears no where in the monthly statement and, as discussed above, was, according to a representative of FinanceAmerica, announced to the defendant at a trade show.

But even assuming for arguments sake that the monthly statement detailed a rate of interest, the court finds that such a monthly statement does not satisfy the "agreement in writing" requirement of the statute. The court finds that the language of the statute contemplates a loan agreement or other document in writing wherein the parties enter into an agreement, or a meeting of the minds, and that this is not satisfied with a unilateral communication, such as a monthly statement, which evidences no agreement or meeting of the minds. The record does not support even a verbal agreement as to a rate of interest. The defendant's bookkeeper and president testified that they were never able to compute or determine the finance charge, that they inquired through the floor plan checker frequently for some clarification of the charge, and that they were unaware that a flat rate charge was being assessed in addition to a finance charge on the outstanding principal balance until that testimony was introduced at trial.

Even if we assume for argument's sake that the statute in question did not require an "agreement in writing" in order for the plaintiff to charge a rate of interest up to 7%, the plaintiff's own documentation would require the plaintiff to use more than simply monthly statements in order to document the transactions. Paragraph three of the security agreement executed by the defendant (Exhibit 2) provides as follows:

Debtor may make application to company for advances and if company elects in its sole discretion to make such advances, same shall be made in such amounts and upon such conditions as company in its sole discretion may determine upon the execution and delivery by debtor of such other and further instruments and documents as may be required by the company.

The terms "instruments" and "documents" are defined under the Uniform Commercial Code. It appears appropriate here to refer to the Uniform Commercial Code to define those terms because the Uniform Commercial Code is referred to in Paragraph 2(c) of the plaintiff's security agreement for a definition of terms and in Paragraph 10 for remedies available upon default. Additionally, the very term security agreement and the style of the security instrument between the parties is derived from the Uniform Commercial Code. M.S.A. § 19.-9105(f) [M.C.L.A. § 440.9105(f)] of the Uniform Commercial Code defines document as a document of title. This would include a trust receipt, for example, as was referred to in the floor plan financing agreements between the defendant and Genesee Merchants Bank & Trust Company, First National Bank of Fenton and General Electric Credit Corporation (Exhibits A, B, and C). M.S.A. § 19.9105(i) [M.C.L.A. § 440.9105(i)] of the Uniform Commercial Code defines instruments as a negotiable instrument evidencing a right to the payment of money. The other three floor plan financing agreements or security agreements in evidence in this case with the other three financial institutions also discuss the use of a negotiable instrument, and in each case promissory notes were used when items of inventory were purchased. While it appears that this was contemplated in the transactions between FinanceAmerica and the defendant, FinanceAmerica for some reason never used such documents or instruments, and as pointed out above, did not at the outset

**2.** The record was even bare of oral testimony from Coachmen or FinanceAmerica regarding the specific rate of interest being charged, however the record also shows that Finance was charging Charay at the approximate rate of 18½% interest.

have a loan agreement or "agreement in writing" as the statute requires. Thus, even if the statute didn't require an agreement in writing at the outset to document the rate of interest being charged, the security agreement between the parties contemplates that advances would be made only upon the execution of documents, meaning documents of title such as trust receipts, or instruments, meaning negotiable instruments such as promissory notes.

Accordingly, the court finds that the financed charges claimed by Coachmen Industries are usurious for the reason that they are in violation of MSA § 19.15(1) et seq. [M.C.L.A. § 438.31 et seq.] at Sec. and M.S.A. § 21.200(275) [M.C.L.A. § 450.1275] for the reason that the parties have not entered into any "agreement in writing" whereby the defendant has agreed to pay any rate of interest.

■ Coachmen has argued to the court that the defendant has gone beyond the scope of its pleadings in raising the usury defense and that the plaintiff has been unduly surprised in this regard. It appears from the record that the plaintiff was not unduly surprised by the issue. First, the plaintiff listed and called three witnesses who testified in reference to the agreement for finance charges. Mr. Ehrler, as described above, testified that Mr. Baker was advised of a verbal communication regarding additional finance charges. Mr. Jeffrey Beucking testified that the defendant's employees often inquired of him when he checked the floor plan about confusion over the amount and rate of the finance charge, and that he would call Chicago and obtain information for them regarding the computation method and the amount of finance charges. Finally, a representative of FinanceAmerica appeared and testified to an orientation that was given to all new dealers and explained that in the ordinary course of setting up a dealership, the dealer would be advised of the method and the rate of finance charges being computed.

It also appears that the plaintiff has long been on notice of the fact that the defendant intended to raise the issue that there was no agreement in writing for a rate of interest.

The plaintiff took an appeal of the interim order entered by this court allowing the defendant to use the plaintiff's secured collateral in the operation of the business. On September 11, the defendant filed and served upon the plaintiff its Appellee's Appeal Brief. At page 7 of that brief, the defendant wrote as follows:

Further, without some evidence before the court, such as a copy of a promissory note showing when the money allegedly due was payable and the interest rate thereon, the court is unable to determine what would be necessary to provide adequate protection to the plaintiff. For instance, plaintiff's main complaint was that current payments of interest would not be made. However, without providing the court evidence as to when payment was due and the interest rate payable on the money, the court has no proof as to what the interest rate accruing is and when payments are due... The trustee does no know how much interest to escrow because there is no note or agreement telling it what the rate of interest is.

At pages 11 and 12 of the Appellee's Brief, the plaintiff contended that

Without proof that plaintiff had a valid assignment of that security interest, was entitled to foreclose on it at that time, *or was entitled to a specific rate of interest on money loaned* and secured by that collateral, the bankruptcy court is unable to do anything else than what it did without perhaps causing irreversible harm to the general creditors. For instance, a corporation may in certain instances agree to pay any rate of interest below 25% when that agreement is in writing. MCLA 438.61. If, however, the agreement is not in writing, one is allowed to charge only 5% interest. MCLA 438.31. If Plaintiff cannot provide such a written agreement, and is not otherwise permitted to charge the 18½% or more it apparently was charging (transcript, page 21), it is not entitled to the recovery of any

interest whatsoever. MCLA 438.32. Thus, plaintiff may not be entitled to interest on that money except perhaps the basic 7% (MCLA 438.31) as compensation for the loss of its use, if it is entitled to current payment which was not shown.

Accordingly, the court finds that the plaintiff knew months prior to the trial that the defendant intended to raise the issue of usury and that the plaintiff was not surprised by the presentation of proofs on that issue at trial. The court finds that the presentation of the merits of this action will be subserved by allowing an amendment of the pleadings to incorporate the issue of usury and further, that the plaintiff has failed to satisfy the court that the admission of such evidence in any way prejudiced the plaintiff from maintaining its action. Accordingly, the court hereby deems the pleadings to be amended to incorporate the issue of usury.

## Issue No. 2
## WHAT IS BALANCE OWED TO COACHMEN INDUSTRIES, INC.?

■ Coachmen argues that notwithstanding the lack of an "agreement in writing" specifying a rate of interest, that the defendant is not entitled to a credit against the principal balance allegedly owed of One Hundred Ninety One Thousand Eight Hundred Eleven Dollars ($191,811) (Exhibit 13) for usurious interest paid. Michigan law is clear that a party claiming that it has paid usurious interest may not obtain a money judgment for damages for usurious interest voluntarily paid. But Michigan law is also abundantly clear that a party may obtain a discharge of a security interest where the balance owed is based upon usurious interest and that a party may set off any usurious interest against monies allegedly owed to the lender. This is exactly what the defendant seeks. The defendant does not seek money judgment against the plaintiff for usurious interest. Instead, it defends the attempt to reclaim its collateral on the basis that all of the money owed to the defendant is usurious interest if all interest payments are credited against principal.

■ In *Gardner v. Mattson,* 38 Mich. 200, the plaintiff brought an action for replevin to recover back personal property belonging to it that had been repossessed by the defendant. The defendant claimed that it was entitled to the property because it was pledged as security on a note. The plaintiff contended and the court found at page 202 of its decision that usurious interest had been charged on the note, and if all the usurious interest charges had been credited against principal, the plaintiff owed the defendant nothing:

> . . . that the notes of November 12 secured by mortgage were thus made up, and included a large amount of usury, and since the giving of these last named notes, the real principal included therein had been fully paid, with compounded interest thereon.

While the court agreed with the proposition that the plaintiff-debtor could not recover back any of the interest that it had paid in a damage action, it was entitled to take a credit for all such interest against any balance the defendant claimed, and thereby eliminate the indebtedness:

> The defense of usury is a personal one, and may be waived, and so may the party voluntarily pay usurious interest, and where he does so he will not be permitted to recover it back. To this extent, the statute undoubtedly goes, but it never was intended that by substituting new paper, with usury added, for the old paper as the same became due, the question of usury could not thereafter be raised, or that the creditor by taking a mortgage upon personal property to secure the payment of such usurious debt could by taking possession of the property and proceeding to sell the same, thereby preclude the debtor, in an action of replevin to recover possession of the property, from showing the entire transaction, upon the theory that the action was not one brought upon the usurious note. To give the statute such a construction would be but pointing out a method for the grasping and unconscionable creditor to evade our usury laws entirely.

This is exactly the result that the defendant seeks. The remedy suggested in *Gardner* of allowing a credit on a note balance owed to the creditor for any usurious interest paid is clearly permissible under Michigan law and does not involve, as plaintiff would suggest, an attempt by the plaintiff to recover back affirmatively in damages the usurious interest paid.

The plaintiff also cites *Dykes v. Wyman*, 67 Mich. 236, 34 N.W. 561 (1887) as authority for its position. *Dykes* is not on point. In that case, a plaintiff who gave a mortgage securing a note with usurious interest paid the note in full. The plaintiff then brought the action to recover back the usurious interest. The trial court's dismissal of plaintiff's claim for damages and request for a money judgment for the amount of the usury paid was entirely correct. However, this is clearly distinguishable from the instant case where the defendant is asking not for a return of money paid, but for credit against an amount allegedly due and owing in the amount of the usurious interest paid.

A recent case illustrates the distinction between a plaintiff's entitlement to bring an action to obtain a credit against the balance owed to a creditor in the amount of any usurious interest paid and a plaintiff's action for damages to recover back that usurious interest. In *Michigan Mobile Home Owner's Association v. Bank of the Commonwealth*, 56 Mich.App. 206, 223 N.W.2d 725 (1974), a class action suit was brought for damages for interest paid on mobile home loans on behalf of all retail customers against the defendant banks and credit unions that had charged in excess of the permissible legal rate. The plaintiffs' complaint was dismissed on a motion for summary judgment. At page 213, 223 N.W.2d 725 of its opinion, the Court of Appeals reasoned as follows:

> Usury was treated as a statutory defense which could only be used as a shield but not as a sword. Since it was a defense, it could be waived by voluntary payment of usurious interest. The penal provision of forfeiture of interest was attached only upon an attempt by the seller, lender or assigns to seek enforcement of the note, bill, etc. By way of a suit upon said note, bill, etc., or by way of foreclosure upon any secured property. Once enforcement was sought and the penal provisions were invoked, all interest paid was treated as payment against any unpaid principal. Even if enforcement of the contract, bill, note, etc., was sought by the seller, lenders or assigns, the borrower would not be able to recover the interest already paid if that amount exceeded the unpaid principal, the rationale being that the excess was voluntarily paid and thus the defense of usury was waived as to that amount. Thus, there was never the right to recover the interest that had been paid; and the right to have whatever interest which had been paid credited against the principal was dependent upon the lender seeking enforcement of the usurious note, bill, contract, etc.

Thus, usury is not an independent cause of action, but a defense. This is an action brought by the plaintiff to reclaim collateral that the defendant contends is security for a usurious note. Consistent with the language of the court in *Michigan Mobile Home Owner's Association*, that defense can be used to entitle the defendant in this action to a setoff for the principal balance allegedly owed on the plaintiff's obligation. As indicated in the plaintiff's own proofs, that balance is One Hundred Ninety One Thousand Eight Hundred Eleven Dollars ($191,811). The defendant's bookkeeper introduced as a summary of original business records a schedule showing all of the interest payments that had been made to FinanceAmerica from the beginning of the floor line. This is Exhibit K. A summary of finance charges assessed according to the plaintiff's own statement indicate that from December of 1977 through October 29, 1981, the last full month prior to the commencement of the trial, the defendant was charged One Hundred Fifty-seven Thousand Nine Hundred Thirty-nine Dollars and 46/100 ($157,939.46) in finance charges. Of this sum, the testimony indicated that

Twenty-eight Thousand Four Hundred Sixty-four Dollars and 18/100 ($28,464.18) of that charge represented interest on the floor line that had been billed but not paid. For the interest paid which is One Hundred Twenty-nine Thousand Four Hundred Seventy-five Dollars and 28/100 ($129,475.28), the defendant is entitled to a credit against the principal balance owed on the note of One Hundred Ninety One Thousand Eight Hundred Eleven Dollars ($191,811). The difference is Sixty-two Thousand Three Hundred Thirty-five Dollars and 72/100 ($62,335.72).

In defendant's Exhibit K, the defendant showed what interest would accrue on the principal balance owed from time to time if that interest were reduced to 5%. However, the defendant takes the position that the proofs clearly indicate that it is entitled to a credit for all interest paid. A 5% rate of interest is permissible under M.S.A. § 19.15(1) [M.C.L.A. § 438.31] on any obligation where there is no stated rate of interest and it does not appear that the parties agree that there should be no interest charged. However, where interest is assessed in excess of the permissible rate, then no interest may be collected. M.S.A. § 19.15(2) [M.C.L.A. § 438.32] provides in pertinent part that:

> Any seller or lender or his assigns who enters into any contract or agreement which does not comply with the provisions of this act or charges interest in excess of that allowed by this act is barred from the recovery of any interest, any official fees, delinquency or collection charges, attorney's fees or court costs and the borrower or buyer shall be entitled to recover his attorney's fees and court costs from the seller, lender or assigns.

The plaintiff makes the final argument that it does not charge usurious interest in this case because the Depository Institutions Deregulation and Monetary Control Act of 1980 has preempted state interest ceilings. The specific provision of the federal act that would be applicable is Section 511(a), which is attached to the plaintiff's pretrial brief. The federal act does not operate in this case for two reasons. First, the federal act only applies

... if the applicable rate prescribed in this section exceeds the rate a person would be permitted to charge in the absence of this section .....

The rate which a lender could charge under the circumstances of this case, assuming compliance with M.S.A. § 21.200(275) [M.C.L.A. § 450.1275] of the Michigan Business Corporations Act requiring an agreement in writing, would be 25%, the criminal usury rate. The rate allowed to be charged pursuant to Section 511(a) of the federal act is, and always has been during the course of the transaction between the plaintiff and defendant in this law suit, less than 25%. Although the plaintiff did not cite any figures to the court, the discount rate on 90 day commercial paper available through the Federal Reserve Bank at Chicago, including the 3% surcharge from time to time affixed to the basic rate, has been as low at 6% in December of 1977 and as high as 18% as of May 5, 1981. The maximum rate permitted under the federal ceiling would therefore be as high as 23% effective May 5, 1981. Thus, the federally prescribed rate, never being higher than the rate permitted under state law for business or agricultural loans to Michigan corporations, is not applicable. Second, the federal act by its terms and according to the opinions of the Federal Reserve Board, does not preempt anything other than rates charged, whether they be in the form of interest, discounts, finance charges, finder's fees and the like. The act does not preempt or bear upon the disclosure requirements or the other substantive provisions of state law imposed by the respective states upon financial transactions.

Accordingly, the court finds that the defendant is entitled to a credit for all interest paid against the principal balance and that the principal balance due and owing by Charay to Coachmen is $62,335.72.

*Issue No. 3*

ADEQUATE ASSURANCE

■ The District Court ordered this court to determine the amount of the deprecia-

tion on the collateral in which Coachmen has a secured interest and the rate of interest to which Coachmen would be entitled through being deprived of that collateral. While the plaintiff did not, in its Complaint or Amended Complaint, request adequate protection from the court for the reason that the collateral was depreciable, the parties both presented proofs on the issue of the depreciation of the collateral and briefed the question for the court.

Based upon the evidence presented, the court finds that the Coachmen collateral did not depreciate or dissipate. First, the evidence presented by the bookkeeper for the defendant indicates that as the old Coachmen inventory was sold and replaced with new inventory in cash proceeds, that the new inventory and cash proceeds were segregated and accounted for and that the exact amount of such inventory and cash proceeds was presently $143,916.28. Additionally, the defendant's president testified that, through the last monthly statement introduced, the defendant had turned or sold the inventory approximately four times and had replaced 1981 units with 1982 units. The president also testified that the types of units, presently on hand, in addition to being later model years, were more salable than the prior Shasta inventory from which it had been converted. This testimony was not disputed by evidence introduced by the plaintiff. The plaintiff appears to be satisfied with relying upon the fact that six 1981 Coachmen units on hand at the time of trial had not been sold. This cannot be considered as tending to establish that the Coachmen collateral had on an overall basis decline in value. Rather, the court finds from the evidence presented that the collateral was both being maintained through its segregation from other assets and the restriction against its use for operating capital, and through the conversion of the entire inventory on a rapid basis into new model year salable inventory. Accordingly, the court finds that the plaintiff is adequately protected and not in need of additional protection since there appears to be

no loss in value of the collateral through depreciation.

This leaves the issue of whether the plaintiff is entitled to adequate protection for interest accruing on the balance owed to it. Even assuming that the balance owed of $62,335.72 accrued interest at the maximum rate provided by law of 25% from the date of the filing of the plaintiff's complaint, the total interest accruing through October of 1982 on the indebtedness would be $23,375.89. The plaintiff is therefore adequately protected by the equity cushion in its collateral and will not be in need of adequate protection until the total of interest accruals plus the principal balance begins to approach the value of the collateral, which the parties agree to be $143,916.28.[3]

The last monthly statement of account introduced into evidence indicated that the prime rate of interest on June 25, 1981 was 20% (see Exhibit 7). Through October of 1982, the interest accruing at 20% on $62,335.72 is $18,700.71. Thus, the loss sustained by the plaintiff through its inability to obtain possession of its collateral of $18,700.72, when added to the balance owing of $62,335.72, totals $81,036.44. Accordingly, the court finds and orders that the plaintiff be granted adequate protection by increasing the balance owed to it by $18,700.72, for a total secured debt of $81,036.44. Additionally, so long as the defendant retains possession of the plaintiff's collateral, the plaintiff's secured indebtedness shall increase by $1,038.93 per month, or the monthly accrual of interest on the principal balance at 20% per annum.

### Issue No. 4
### IS THE PLAINTIFF ENTITLED TO RECLAMATION?

■ While not pled by the plaintiff, the plaintiff introduced evidence and presented legal argument in briefs contending that the defendant was incapable of economic recovery and for that reason that its complaint for reclamation ought to be granted.

---

**3.** The plaintiff has filed a disclosure statement for a liquidation plan of arrangement of the

debtor and in the disclosure statement states that the value of the collateral is $143,916.28.

The court deems the plaintiff's complaint to be amended by the proofs and will undertake to consider this issue.

The court finds that the evidence presented indicates that the debtor is capable of financial recovery. Through the date of trial, the defendant earned net income of approximately $35,000 while accruing as an expense interest to Coachmen on its claimed principal balance at 22% and interest to the Small Business Administration at 15%. The defendant earned these profits while the prime rate of interest, according to the plaintiff's monthly statements of account, were escalating. The defendant's president also testified to the reasons for his successful performance. He indicated that a list of dealers had failed and that there were no other dealers remaining in Shiawassee, Livingston or Lapeer County. He further testified that seven recreational vehicle dealers in Genesee County had either failed or stopped handling recreational vehicles. He attributed the dramatic improvement to a reorganization of the business that consolidated a three lot operation in three counties to a single location, to a reduction of the inventory on hand, to a consignment arrangement with customers which avoids finance charges, and to the concentration on a market for the sale of higher priced units which reduces expenses of operations.

The only evidence presented by the plaintiff which was offered to show that the defendant could not be profitable was testimony by a Mr. Laughlin that the defendant did not generate the gross profit generally attained by successful recreational vehicle dealers. The court finds this testimony to be not directly probative on the issue of the defendant's ability to generate net income. Accordingly, the court makes a finding that the debtor is capable of rehabilitation.

Notwithstanding this finding, the plaintiff must receive either the secured balance owed to it or the collateral in which it has a security interest. The court takes notice of the fact that two disclosure statements and proposed plans of arrangement have been filed. The first is a liquidation plan of arrangement and a disclosure statement filed by Coachmen Industries. The second is a disclosure statement and plan of arrangement filed by the debtor. The confirmation of either plan of arrangement will be dispositive of the plaintiff's rights in its collateral. The failure of a confirmation of either plan of arrangement would entitle the plaintiff to the further assistance of this court. Accordingly, in the event that neither plan of arrangement or modifications of those plans are confirmed, the plaintiff may move the court for relief from the automatic stay. Until such time, the plaintiff's complaint for reclamation is denied.

An order in conformance with this memorandum opinion shall be issued.